UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DALE CUTLER,

                    Petitioner,                    Case No. 1:12-cv-331

v.                                                 Honorable Robert Holmes Bell

CINDI CURTIN,

                    Respondent.
_____/

## OPINION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner is serving a term of 11 to 25 years, imposed by the Montcalm County Circuit

Court on November 10, 2009, after a jury convicted Petitioner of assault with intent to do great

bodily harm less than murder, MICH. COMP. LAWS § 750.84.  In his amended *pro se* petition,

Petitioner raises two grounds for habeas corpus relief, as follows:

> 1.     THE TRIAL JUDGE[']S REFUSAL TO GIVE [A] SELF-DEFENSE
>        INSTRUCTION[] DENIED [PETITIONER'S] CONSTITUTIONAL RIGHT
>        TO DUE PROCESS AND TRIAL BY JURY.
>
> 2.     INEFFECTIVE ASSISTANCE OF COUNSEL.

(Pet., docket #5, Page ID##65, 66.)  Respondent has filed an answer to the petition (docket #10)

stating that the grounds should be denied because they have no merit.  Upon review and applying

the AEDPA standards, the Court will deny the petition for lack of merit in the grounds presented.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from Petitioner's beating of Ryan Young on June 11, 2009, after Young allegedly made sexual advances towards Petitioner.  Petitioner was tried before a jury on November 10, 2009.

Candy Cole testified that she is friends with Ryan Young. (Tr. I (Nov. 10, 2009), 46.) On June 10, 2009, they went to a bar to celebrate Young's birthday.  (Tr. I, 46-47.)  Young and Cole sat with another of Young's friends, Anna, and Anna's mother.  (Tr. I, 48, 50.)  Cole noticed Petitioner walking around the bar and looking at their table, specifically at Young.  (Tr. I, 49.)  Cole asked Young if he knew the person but he did not.  (Tr. I, 50.)  Eventually, Petitioner joined their table and introduced himself as "Al."  (Tr. I, 50.)  When the bar closed, they left.  Young invited Petitioner to go with them.  (Tr. I, 50.)  Young was pretty drunk, but Cole had seen him more drunk. (Tr. I, 50-51.)  Cole drove Young and Petitioner to Anna's mom's house for a short time, and then she drove them to Young's apartment.  When they arrived at Young's house, Petitioner and Young got out of the car and walked into Young's apartment.  (Tr. I, 52-53.)  Cole reviewed pictures taken of Young's neck and face after the assault, and she confirmed that he did not have those injuries before she dropped him at his home.  (*Id.* at 54.)

Ryan Young testified that he called Candy Cole on June 10, to see if she would like to go out for Ryan's birthday.  (Tr. I, 61-62.)  Young turned twenty-two at midnight.  (Tr. I, 62.)  Cole and Young went to the Harvard Bar to celebrate his birthday, and they met up with his friend, Anna, and Anna's mom, Tina.  (Tr. I, 62-63.)  Young had two Long Island Ice Teas at the bar.  (Tr. I, 63, 65.) Eventually, Petitioner started a conversation with Young and sat at their table. (Tr. I, 64.)  After

the bar closed, everyone went to Tina's house and hung out for a little while.  (Tr. I, 67.)  Eventually,

Candy Cole drove Young and Petitioner to Young's apartment.  (Tr. I, 69.)  At that point, Cole left

to go home.  (Tr. I, 69.)  When he went into his apartment, Young left the door unlocked for a friend

who was staying with him.  (*Id.* at 96.)  Young immediately went to his room to change into a pair

of basketball shorts.  (Tr. I, 70.)  Petitioner came into Young's bedroom as he was changing, and

Young asked, "[D]id you want to do anything or did you just want to go to bed?"  (Tr. I, 71, 89, 111.)

Young testified that he thought it was okay to ask because Petitioner had come home with him and

because Young was identifiably interested in men, but he left the option open for Petitioner.  (Tr. I,

72, 87, 89.)  Young stated that he at no time touched Petitioner.  (Tr. I, 73, 109.)  Young testified that

Petitioner said, "[Y]eah, I'm going to do something you fucking faggot.  And [then put] his arm

around my neck and beat me uncontrollably until I was unconscious . . . ."  (Tr. I, 72.)  Young stated

that Petitioner's arm was so tight around his neck that he had strangulation marks, which he

identified in pictures for the jury.  (Tr. I, 73-74, 90.)  Young remembers that Petitioner choked him

until he passed out.  When Young came to, Petitioner was still punching his face until he was

completely unconscious.  (Tr. I, 74.)  Petitioner hit Young "a good 30 times."  (Tr. I, 91.)  Petitioner

knocked Young's tooth out.  (Tr. I, 73.)  Young identified pictures of his face and mouth for the jury.

Young stated that he laid on the floor until he regained consciousness sometime later.  He thought

he was unconscious for at least a half hour.  (Tr. I, 74.)  He was dazed and could not find his phone,

but he felt like he had to get out of there.  (*Id.* at 93.)  After seeing his reflection in the mirror, Young

knew that he was injured very badly and that he had to go to the hospital.  He wrapped a towel

around his head and went to the neighbor's house at 4:30 or 5:00 a.m.  (Tr. I, 75.)  The neighbor took

one look at Young and immediately drove him to the hospital.  (Tr. I, 75.)  At the hospital, Young

was taken to a room almost immediately, because of his condition. (Tr. I, 94.) Young was sedated and essentially bed-ridden for at least two days following the assault. (Tr. I, 98.) Young testified that he spoke with Police Sergeant Blomstrom shortly after he arrived at the emergency room and again later while he was still in the hospital. He could not remember much of what he told Blomstrom, as he was "really out of it." (Tr. I, 75, 95.) Young acknowledged that he first thought that his neighbor, Doug, was responsible for the beating, because Doug had been harassing him and threatening him for weeks and because Young's mind was not clear. (Tr. I, 77, 107-08.) Young thought that, because Doug frequented the Harvard Bar, he might have had Petitioner commit the assault. (Tr. I, 107, 114.) Young actually applied for personal protection order against Doug Jackson on June 16, 2009. (Tr. I, 104, 106-08.)

Jessica Evans testified that she lived in a neighboring apartment in the same building as Young, and she had known him as a neighbor for about two years. (Tr. I, 20-22.) She saw him almost every day, either going into or coming out of his apartment, but she rarely talked to him. (Tr. I, 22.) On June 11, 2009, at about 5:00 a.m., she heard a knock at her door. She looked out the peephole on her door and saw someone she could not recognize. She heard the person saying something, and she was afraid to open the door. When she opened it, she saw that it was Young, though she had not been able to recognize him because he had been beaten so badly. She asked what had happened, but Young was unable to tell her. (Tr. I, 20.) She took Young to the emergency room and dropped him off. (Tr. I, 20-21.)

City of Greenville Police Sergeant Brian Blomstrom testified that he met Ryan Young at the hospital on June 11, 2009. (Tr. I, docket #13, 23.) Blomstrom stated that Young's face had been badly beaten and that Young had strangulations marks around his neck. Young was very

agitated and only somewhat coherent, and he smelled of alcohol.  (Tr. I, 23.)  Blomstrom identified

the photographs he took of the injuries to Young's left eye, lips, neck, the side of his face, and under

his ear, which included numerous abrasions and lacerations.  (Tr. I, 25-28.)  Blomstrom also noticed

that Young was missing a tooth.  (Tr. I, 29.)   Blomstrom received permission to go to Young's

apartment, where he found blood spattered on the walls, blood on the carpet, and a bloody bed sheet

in the bedroom.  Blomstrom identified photographs of these observations for the jury.  Blomstrom

also found a tooth in the bedroom.  Some of the bloody items were located on one side of the room,

and more blood and the tooth were located on the other side of the room.  (Tr. I, 32-34.)  Blood was

smeared on the door jamb, where a bloody person had left the room.  (Tr. I, 35, 43.)  Some days later,

after further investigation, Blomstrom requested a warrant for Petitioner's arrest.  (Tr. I, 37.)

Blomstrom testified that Young was a small man, approximately 5'6" tall and of a thin build, maybe

130 to 140 pounds.  (Tr. I, 44-45.)

        City of Greenville Public Safety Officer McConkie testified that he picked up

Petitioner from the Kent County Correctional Facility and transported him to the Montcalm County

Jail. (Tr. I, 116.)  Petitioner asked what he was being charged with.  (Id.)  When McConkie replied

that he was being charged assault with intent to commit great bodily harm less than murder,

Petitioner replied, "[H]ow can I be charged with that?  I didn't even use a weapon this time."  (Tr. I,

116-18.)

        The defense presented two witnesses.  Officer Blomstrom testified that in his first

interview with Mr. Young, Young stated that he left the bar at 3:45 a.m.  (Tr. I, 125, 27.)  Young

indicated that he went to sleep on his bed.  He left the door open because he had a person staying

with him.  (Tr. I, 127.)  Young stated that he woke up when someone was assaulting him.  (Tr. I,

128.)  Young indicated that the person was Doug Jackson.  (Tr. I, 130.)  Blomstrom talked to Young

again at the hospital.  While most of the details remained the same, Young told Blomstrom that the

man was larger than Doug Jackson and his voice was different.  (Tr. I, 130-31, 135.)  A few days

after the incident, Blomstrom interviewed Young again.  (Tr. I, 131.)  Young changed his story

somewhat.  Young indicated that the differences between his stories was because of his injuries,

which Blomstrom found plausible in light of the seriousness of Young's injuries and the vagueness

of the initial interviews.  Blomstrom testified that Young "was beaten up very, very badly."  (Tr. I,

132.)

Petitioner testified that on June 10, he was at the Harvard Bar, where he was an

unofficial bouncer.  (Tr. I, 137, 147.)  Petitioner sat down to talk with Mr. Young and his friends a

couple of times.  (Tr. I, 139.)  Petitioner specifically wanted to talk with Anna.  (Tr. I, 138.)  Before

the bar closed, Petitioner left with Young, Anna and her mom, and Candy.  (Tr. I, 139.)  They went

to Anna's mom's house to smoke marijuana for approximately forty-five minutes.  (Tr. I, 140.)

Prior to leaving, Petitioner asked Anna if he could sleep on the couch but she said no.  (Tr. I, 141.)

Candy then drove Petitioner and Young to Young's house where Petitioner thought they would just

be hanging out and having a beer.  (Tr. I, 142.)  Petitioner was under the impression that he would

crash at Young's house and get a ride home in the morning.  (Tr. I, 142.)  When they arrived at

Young's house, Petitioner was surprised that Candy did not come in.  (Tr. I, 142.)  When they

entered the apartment, Petitioner looked in the refrigerator for a beer but there was no beer.  (Tr. I,

143.)  Because Young had a guest coming in the morning, he suggested that Petitioner sleep in his

room and that Young would sleep on the couch, so that his friend did not come in to find a strange

man on the couch. (Tr. I, 143.)  Petitioner stated that he crashed on Young's bed and went to sleep

- 6 -

with all of his clothes on.  During this time, Young was in the shower.  (Tr. I, 144.)  Petitioner

testified that he woke up to find Young in the bed with him.  Young had his mouth on Petitioner's

neck and Young's hand down his pants.  (Tr. I, 145.)  Petitioner testified that he was shocked and

that he had never experienced anything like what happened.  He shoved Young, but Young put his

leg on top of Petitioner.  (Tr. I, 145.)  Petitioner pushed Young away with his hands, but Young

punched Petitioner in the head.  (Tr. I, 146.)  Young and Petitioner then rolled off the bed, and

Petitioner landed on top.  Young no longer had a hold on Petitioner.  (Tr. I, 146.)  Petitioner punched

Young four or five times, in an "explosive burst," so that Young would not come after him.  (Tr. I,

146, 148, 150.)  Petitioner acknowledged that he did not tell Young to get off of him, and he further

acknowledged that he was "a pretty good size guy."  (Tr. I, 146-47.)  He also testified that he trained

for cage fights so he "d[id] strike very hard."  (Tr. I, 147.)  He testified, "I was trying to get him.  I

wanted to get away but I wanted to make sure he couldn't do anything to me when I left."  (Tr. I,

147.)  Young was not moving when Petitioner left the apartment and walked home.  (Tr. I, 146-49.)

       Petitioner acknowledged on cross-examination that he was telling his story for the

first time in court.  He stated that he never reported being sexually assaulted, because he would be

embarrassed to tell his friends that he had been molested.  He stated that he did not expect that

Young would report the event, either.  (Tr. I, 154-55, 157-58.)

       At the close of proofs, the parties discussed the jury instructions.  Petitioner sought

a jury instruction on self-defense.  The trial court held, however, that the testimony was insufficient

to establish that the "defendant honestly and reasonably believed that he was in danger of imminent

death or serious bodily harm and used only the amount of force it appeared immediately necessary

to protect against that danger."  (Tr. I, 160-61.)  The court reasoned as follows:

In this particular case I did try to take notes as Mr. Cutler testified. The testimony from the defendant was that he woke to being sexually molested by Mr. Young and that Mr. Young then punched him in the head. The defendant then pushed him back, they rolled off onto the floor, defendant then was on top and then in an explosive burst he punched him four to five times. Mr. Young did not move after that. In conjunction with Mr. Cutler's testimony so far as training for cage fights, being a unofficial bouncer at the bar, and then his testimony in essence as to why he did this that he wanted to get away and make sure that Mr. Young did not follow him. I'm not seeing a basis then for self-defense.

It really is somewhat clear from his testimony later on that he did this because he was sexually molested by someone else and just as he never thought about reporting it, he was surprised that Mr. Young would report it. In essence that he got what he deserved and I'm not seeing anything that indicates that Mr. Cutler was in any way in any fear of being assaulted or any type of harm that would justify doing what he did.

(Tr. I, 161-62.)

At the conclusion of trial, the jury found Petitioner guilty of assault with intent to do great bodily harm less than murder. (Tr. I, 196.) On January 7, 2010, Petitioner was sentenced to serve a term of 11 to 25 years as a habitual offender. (Sentencing Transcript, (S. Tr.), 9, docket #12.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on June 30, 2010, raised the same two issues presented in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #17.) Petitioner filed a motion to remand, which was denied by the Michigan Court of Appeals on August 4, 2010. (*See* Aug. 4, 2010 Mich. Ct. App. Order, docket #16.) By unpublished opinion issued on June 16, 2011, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* June 16, 2011 Mich. Ct. App. Opinion (MCOA Op.), docket #17.)

- 8 -

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same two claims raised before and rejected by the Michigan Court of Appeals.  Petitioner was granted leave to amend his application, in which he further developed his first issue.  By order entered December 7, 2011, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #17.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly

established, the Court may not consider the decisions of lower federal courts. *Lopez v, Smith*, 135

S. Ct. 1, 4 (2014); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).

Moreover, "clearly established Federal law" does not include decisions of the Supreme Court

announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38

(2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have

appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-

court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*,

132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state

court applies a rule different from the governing law set forth in our cases, or if it decides a case

differently than we have done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694

(citing *Williams*, 529 U.S. at 405-06). The court may grant relief under the "unreasonable

application" clause "if the state court correctly identifies the governing legal principle from our

decisions but unreasonably applies it to the facts of the particular case." *Id.* A federal habeas court

may not find a state adjudication to be "unreasonable" "simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal law

erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the

issue is whether the state court's application of clearly established federal law is "objectively

unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application

clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that

there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134

- 10 -

S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784 (2011)).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### A.    Ground I:  Self-Defense Instruction

In his first ground for habeas corpus relief, Petitioner argues that the trial court erred by refusing to provide a jury instruction on self-defense, in violation of his Sixth Amendment right to a jury trial and his Fourteenth Amendment due process right to present a defense.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. To be entitled to habeas relief on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned. Rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair. *See Estelle v. McGuire,* 502 U.S. 62, 72  (1991) (holding that erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with

unfairness as to deny due process of law"); *see also Henderson v. Kibbe*, 431 U.S. 145, 155 (1977) (holding that a petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process"); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same).  Similarly, the failure to give an instruction that is supported by the evidence does not automatically entitle a petitioner to habeas relief; the failure to instruct must have rendered the petitioner's trial fundamentally unfair.  *See Cupp v. Naughten,* 414 U.S. 141, 147 (1973); *Daniels v. Lafler,* 501 F.3d 735, 741 (6th Cir. 2007).  State law instructional errors rarely form the basis for federal habeas corpus relief.  *See Estelle,* 502 U.S. at 71–72.

Notwithstanding this strict standard, in *Taylor v. Withrow,* 288 F.3d 846 (6th Cir. 2002), the Sixth Circuit declared that a claimed error in the denial of an instruction on self-defense is cognizable on habeas review.  The *Taylor* court determined that, where there exists sufficient evidence to support the defense of self-defense, a defendant has a fundamental due process right to the issuance of an instruction on self-defense.  *Id.* at 851.  The court acknowledged that the Supreme Court had never directly addressed the question, but it determined that the law nevertheless was clearly established, because the right to an instruction was a necessary corollary of the right to present a complete defense.  *Id.* at 852 (citing *Mathews v. United States*, 465 U.S. 58, 63-64 (1988) (holding on nonconstitutional grounds that, where sufficient evidence supports the defense, a federal defendant is entitled to an instruction on entrapment)).  As applied to the facts of the case, however, the *Taylor* court held that the petitioner was not entitled to habeas relief, because he had failed to establish entitlement to the instruction under Michigan law.  *Id.* at 853.

In light of the court's holding that Taylor was not entitled to the instruction under Michigan's narrow definition of self-defense, the *Taylor* court's determination of the constitutional question was mere dicta. *See Newton v. Million,* 349 F.3d 873, 877 (6th Cir. 2003) (holding that *Taylor*'s constitutional determination was dicta), *abrogated on other grounds as recognized in English v. Berghuis,* 529 F. App'x 734, 744-45 (6th Cir. 2013) (quoting *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000)); *see also Horton v. Warden*, 498 F. App'x 515, 522 n.2 (6th Cir. 2012) (noting the existence of a question about the binding nature of *Taylor*, but finding that a self-defense instruction was not warranted). Moreover, in a published decision issued two years after *Taylor*, the Sixth Circuit held that no clearly established Supreme Court decision requires a state court to issue an instruction on self-defense. *See Phillips v. Million*, 374 F.3d 395, 397-98 (6th Cir. 2004). Despite the fact that *Taylor*'s constitutional conclusion was mere dicta, subsequent, non-binding court opinions continue to cite *Taylor* as controlling precedent. *See, e.g., Neal v. Booker*, 497 F. App'x 445, 451 (6th Cir. 2012); *Lannert v. Jones*, 321 F.3d 747, 754 (8th Cir. 2003); *Guajardo v. Rapelje*, No. 2:14-cv-10260, 2015 WL 1491729, at *5 (E.D. Mich. Mar. 31, 2015); *Gomez v. McQuiggin*, No. 2:10-cv-14408, 2012 WL 5187750. at *5 (E.D. Mich. Oct. 19, 2012).

Although the precedential value of *Taylor* is uncertain, this Court will assume without deciding that the Sixth Circuit's decision in *Taylor* constitutes binding precedent and that a defendant has a due process right to a jury instruction on self-defense, if he introduces sufficient evidence to support the defense. Under Michigan law, one acts lawfully in self-defense if he honestly and reasonably believes that he is in danger of serious bodily harm or death, as judged by the circumstances as they appeared to the defendant at the time of the act. *Blanton v. Elo*, 186 F.3d 712, 713, n.1 (6th Cir. 1999) (citing *People v. Heflin*, 456 N.W.2d 10, 18-19 (Mich. 1990)). "[T]he

touchstone of any claim of self-defense . . . is *necessity*." *People v. Riddle*, 649 N.W.2d 30, 38

(Mich. 2002) (emphasis in original). A defendant is not entitled to use any more force than is

necessary to defend himself. *People v. Kemp*, 508 N.W.2d 184, 187 (Mich. Ct. App. 1993); *People*

*v. Deason*, 148 N.W.2d 72, 74 (Mich. Ct. App. 1985).

　　　　　While noting that the question was a close one, the Michigan Court of Appeals held

that there was not sufficient evidence to justify a self-defense instruction, as follows:

> A successful self-defense claim requires a defendant to have had an honest
> and reasonable belief that he was in danger and used only that amount of force
> necessary to defend himself. *See People v George*, 213 Mich App 632, 634–635; 540
> NW2d 487 (1995); *People v Kemp*, 202 Mich App 318, 322; 508 NW2d 184 (1993).
> Generally, a defendant cannot claim self-defense where he used excessive force, or
> was the initial aggressor. *Kemp*, 202 Mich App at 322–323.
>
> We find this is a close question. However, having reviewed the record, and
> the trial court's reasoning for denying the instruction, because the testimony in the
> record supports the trial court's characterization of the evidence, and the question
> whether an instruction is applicable to the facts of the case is reviewed for an abuse
> of discretion, *Dobek*, 274 Mich App at 82, we find no abuse of discretion in the trial
> court's decision to deny the instruction.
>
> The victim was about 5'6", with a thin build at only 130–140 pounds.
> Defendant was "a pretty good size guy," trained in cage fighting, and was an
> unofficial bouncer at the bar where he met the victim. According to defendant, the
> victim initiated the altercation, first by sexually assaulting him and then by punching
> him once in the head. Defendant testified that, in response, he threw the victim off
> the bed and "ended up on top" and that, in the process, the victim no longer had hold
> of him as "the hold got broke when we fell to the ground." Defendant further
> testified, "Then I was on top then and I punched him" four or five times; "I was
> trying to get him. I wanted to get away but I wanted to make sure he couldn't do
> anything to me when I left " (emphasis added). After these four or five punches,
> "[the victim] didn't move." Defendant admitted he caused the severe injuries
> sustained by the victim and there was no indication that defendant was injured. He
> further admitted that, based on his cage fight training, "I do strike very hard."
>
> Under the circumstances, even accepting defendant's testimony that the
> victim sexually assaulted him and punched him once in the head, defendant cannot
> assert self-defense because he used excessive force to repel the attack he claims was
> mounted by the victim. Indeed, defendant did not try to merely subdue the victim,

but punched the victim in the face hard enough to knock out teeth until the victim was unconscious. Given defendant's fight training and the size difference between him and the victim, this far exceeded the force necessary for defendant to defend himself. *Kemp*, 202 Mich App at 322. Thus, the trial court did not abuse its discretion in denying defendant's request for self-defense instruction because the evidence did not support it.

(MCOA Op. at 3-4) (footnote omitted).

In sum, both the trial and appellate courts determined that Petitioner used extreme force to subdue Young, a much smaller man, resulting in very serious injuries. The state courts held that Petitioner's testimony was insufficient to support a conclusion that Petitioner honestly believed that he remained in danger from Young or that his purpose was only to subdue Young.

The courts' factual determinations were entirely consistent with the record evidence. Moreover, the court reasonably applied those facts to the Michigan standard for self-defense. Petitioner admitted that Young was a small man and that he himself was a good-sized man. He further acknowledged that Young no longer had any hold on him once they were on the floor. In addition, Petitioner at no time suggested that he was actually afraid of further assault from Young or that punching Young repeatedly was the only way he could have subdued Young. Further, he acknowledged being aware that he punched extremely hard and that his punches were conducted in an "explosive burst," not an attempt to subdue Young. Indeed, Petitioner at no time suggested that Young was still trying to assault him. Moreover, Young's injuries were so extreme that his neighbor could not recognize him. Blood was sprayed on the wall, pooled on the floor and on a bed sheet, and Young's tooth was carried across the room. Under the circumstances, Petitioner's evidence failed to show that he honestly or reasonably believed that he was under any immediate threat from Young at the time he began punching him. Petitioner did not testify that he believed that the amount of

force he used was in any way necessary to the circumstances, nor did other facts suggest that such force was necessary.

For all these reasons, the state court reasonably concluded that Petitioner failed to show both that he believed at the time he repeatedly punched Young that he was in danger from Young and that his use of force was necessary to prevent the assault. As a consequence, a reasonable jurist could conclude that Petitioner's evidence failed to demonstrate that Petitioner was entitled under Michigan law to an instruction on self-defense. *See Taylor*, 288 F.3d at 853 (holding that the petitioner had failed to demonstrate entitlement to a self-defense instruction); *Horton*, 498 F. App'x at 523 (holding that reasonable jurists could disagree about whether the evidence of self-defense was sufficient to warrant the instruction). The state court's decision therefore was not an unreasonable application of clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.

**B.      Ineffective Assistance of Counsel**

Petitioner next argues that his trial attorney was ineffective in failing to move to strike a portion of his statement to Officer McConkie. As discussed, Petitioner asked McConkie, ""[H]ow can I be charged with that? I didn't even use a weapon this time." (Tr. I, 116-18.) Petitioner concedes that the statement "I didn't even use a weapon" is admissible as an implied admission, but he argues that the words "this time" should have been redacted and that his attorney was ineffective for failing to object to their inclusion.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's

performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

- 17 -

The court of appeals rejected Petitioner's claim of ineffective assistance of counsel,

as follows:

In *People v. Rushlow*, 179 Mich. App 172, 176; 445 NW2d 222 (1989), this Court held that "a prior statement does not constitute a prior bad act coming under MRE 404(b) because it is just that, a prior statement and not a prior bad act." *Id.*, citing *People v. Goddard*, 429 Mich. 505, 518; 418 NW2d 881 (1988). Defendant contends that these cases are distinguishable because the words "this time" were not a threat, as were the prior statements found admissible in *Rushlow and Goddard*. Although defendant is correct that the statements at issue in those two cases were threats, this Court has never limited Rushlow's application only to prior statements that were threats. Rather, multiple panels of this Court have used Rushlow to conclude that the admission of non-threat statements that evidence prior bad acts were admissible. See, e.g., *People v. Treadway*, unpublished opinion per curiam of the Court of Appeals, issued December 8, 2009 (Docket No. 286573) (admitting statements that the defendant "was not afraid to fight the employees, and that he would 'kill all you motherfuckers' because he was just released from prison after 14 years and was not afraid to return there"); *People v. Postell*, unpublished opinion per curiam of the Court of Appeals, issued April 29, 2004 (Docket No. 245728) (holding in a case involving an armed robbery charge that statements the defendant made to his girlfriend "regarding how to mail marijuana to jail would not be inadmissible bad acts evidence"); *People v. Payne*, unpublished opinion per curiam of the Court of Appeals, issued January 22, 2004 (Docket No. 243032) (holding in a case involving first-degree criminal sexual conduct charge that the defendant's statement that "he traded the complainant in for a 'newer model – when he met [another child]' and that defendant responded by telling her that '[the other child] stole his heart the same way [the complainant] did'["] was not inadmissible bad acts evidence); *People v. Verbruggen*, unpublished opinion per curiam of the Court of Appeals, issued October 11, 2002 (Docket No. 231970) (in a first-degree criminal sexual conduct case, holding that the admission of the defendant's statement, "Why don't you shave. If you did shave, you'd look like a ten-year-old and I've fucked ten-year-olds before" did not constitute a prior bad act under MRE 404(b)).

Furthermore, as these cases make clear, not only does the statement not need to be a threat to be admissible, but the statement is admissible even when it references an act almost identical to the charge. *Payne*, slip op at 3; *Verbruggen*, slip op at 2. Accordingly, there was no error in admitting defendant's entire statement, including the words "this time." Our conclusion that there was no error in the admission of the statement also requires the conclusion that there is no ineffective assistance of counsel for failure to object or redact the statement, as counsel is not required to make a meritless objection. *People v. Snider*, 239 Mich. App 393, 425; 608 NW2d 502 (2000).

MCOA Op. at 5-6.

The court of appeals, interpreting Michigan law, held that Petitioner's entire statement was properly admitted at trial. The state court's determination of its own law regarding the admission of evidence is not subject to review in this Court. It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 68. The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76) (holding that "'a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus'").

Because the state court found that the statement was properly admitted, Petitioner cannot demonstrate that his attorney rendered ineffective assistance of counsel when he failed to challenge the statement. As the state court recognized, trial counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000). The state-court's rejection of Petitioner's claim of ineffective assistance of counsel therefore constituted an entirely reasonable application of clearly established Supreme Court precedent.

## Conclusion

For the foregoing reasons, the Court will deny the habeas petition for lack of merit in the grounds presented.

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could conclude that this Court's dismissal of Petitioner's claim regarding the self-defense instruction was debatable or wrong.  Therefore, the Court will grant Petitioner a certificate of appealability with respect to his first habeas ground only.

A Judgment and Order consistent with this Opinion will be entered.


Dated: <u>June 30, 2015</u>                            <u>/s/ Robert Holmes Bell</u>
                                                ROBERT HOLMES BELL
                                                UNITED STATES DISTRICT JUDGE